# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| BETH GALLOWAY, | |
| Movant, | No. C20-0097-LTS |
| | (Crim. No. CR16-0068-LTS) |
| vs. | |
| | **MEMORANDUM** |
| UNITED STATES OF AMERICA, | **OPINION AND ORDER** |
| Respondent. | |

_____

This matter is before me on petitioner Beth Galloway's pro se motion (Doc. 1) to vacate, set aside or correct her sentence pursuant to 28 U.S.C. § 2255 due to ineffective assistance of counsel. Galloway's trial counsel has filed two court-directed responses (Docs. 4, 15) and the Government has filed a resistance (Doc. 5) and a supplemental response (Doc. 16). Galloway has filed a reply (Doc. 10), two documents the Clerk's office docketed as correspondence (Docs. 12, 13) and a reply (Doc. 19) to the Government's supplemental response.

## I.    BACKGROUND

The Eighth Circuit Court of Appeals summarized the events leading to the case as follows:

> James Plower's house in Martelle, Iowa, burned down on July 25, 2013. At the time, the house was empty because Plower had moved in with his then-girlfriend, Galloway, who lived in Olin, Iowa. . . . After the fire, authorities received a tip from an arson hotline and an investigation ensued, resulting in the instant charges against Galloway.
>
> At trial, Plower testified as a cooperating witness for the government after pleading guilty to mail fraud and use of fire to commit a felony for setting

the fire that consumed his home. He testified about his romantic relationship with Galloway and explained his financial situation just prior to the fire, including that he was living paycheck to paycheck. He explained that the situation worsened when Galloway lost her job and that the couple discussed ways to get money, which included legitimate ideas like redoing the house to sell, as well as the questionable idea to set the house on fire. Plower said that the two talked about ways to accomplish the fire. He also testified that Galloway knew about fire investigations because she had been a member of the Onslow fire department.

The jury heard testimony from Plower and others regarding multiple attempts to set fire to the house prior to Plower's successful attempt on July 25, 2013. Plower testified that two weeks prior, Galloway left their house in the middle of the night, told Plower she was "going to the Martelle house," and when she returned she told him that "she couldn't get the house going." She told Plower she had tried to start the fire near the wall in the bathroom. . . . It was Plower's next attempt, on July 25, that was successful. This time he set fire to the same spot in the basement, went home, and he and Galloway heard the fire report over the radio. The two went to the Martelle house at that time.

*United States v. Galloway*, 917 F.3d 631, 632-33 (8th Cir. 2019). The trial jury heard the grand jury testimony of Galloway's son, Isaac Williams, in which he described how Galloway drove him to the house on two occasions prior to July 25, 2013, and sent him inside to start a fire, but he was unsuccessful. *Id.* at 633.

With regard to post-fire activities, the Eighth Circuit stated:

Plower testified about filing the insurance claim and authenticated documents in court showing payments that were made. He received checks from Nationwide through the mail and deposited them at the bank and paid off the mortgage on the house. Plower explained that he and Galloway used the rest of the insurance proceeds to pay their living expenses, that Galloway additionally gave a portion of the proceeds to her father and that she also used some of the money herself to pay legal fees related to a child custody case. Ultimately investigators caught up with Plower and he admitted his criminal activity without implicating Galloway. He did, however, tell Galloway that he would have to take out some money before they froze his bank accounts and the two devised a plan to give the cash to a friend, Jean McPherson, for safekeeping. McPherson confirmed that

2

Galloway and Plower jointly approached her and asked her to hold onto some cash for them.

*Id.*

On August 23, 2016, the grand jury returned an indictment charging Galloway with three counts related to arson. Crim. Doc. 2. On March 16, 2017, a jury found Galloway guilty of (1) mail fraud in violation of 18 U.S.C. § 1341 (Count 1); (2) use of fire and aiding and abetting the use of fire to commit a felony in violation of 18 U.S.C. § 844(h) (Count 2); and (3) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 3). Crim. Doc. 51. Galloway filed a motion (Crim Doc. 69) for a new trial and judgment of acquittal, which I denied. Crim Doc. 75.

On April 11, 2018, I sentenced Galloway to 144-months' imprisonment with 2 years of supervised release. Crim Doc. 87, 88. By statute, Count 2 carried a 120-month mandatory minimum sentence, to be served consecutively to the sentence imposed on Counts 1 and 3. Crim Doc. 98 at 5. The United States Sentencing Guidelines range on Counts 1 and 3 was 70 to 87 months which, when added to the 120-month minimum sentence on Count 2, resulted in a combined range of 190 to 207 months' imprisonment. *Id.* Galloway filed a motion (Crim. Doc. 84) for a downward variance based, in part, on her family background, including past domestic abuse, child custody and her employment history. I granted that motion, varying downward to concurrent terms of 24 months on Counts 1 and 3 and the mandatory minimum of 120 months on Count 2, for a total sentence of 144 months. Crim. Doc. 98 at 31. In addition, I ordered restitution in the amount of $152,874.58. *Id.* at 32-33.

On appeal, the Eighth Circuit Court of Appeals affirmed Galloway's conviction and sentence. *United States v. Galloway*, 917 F.3d 631 (8th Cir. 2019). Galloway then filed a petition for writ of certiorari with the Supreme Court, which was denied on October 7, 2019. *United States v. Galloway*, 140 S. Ct. 77 (2019).

Galloway filed the present motion on September 29, 2020, raising three claims of ineffective assistance of trial counsel. Doc. 1 at 13, 27. On December 20, 2021, I

3

entered an order (Doc. 3) pursuant to Rule 4 of the Rules Governing 28 U.S.C. § 2255 Cases in which I allowed Galloway's § 2255 to proceed and directed responses from her prior counsel and the Government. On January 24, 2022, Galloway's trial counsel, Michael Lahammer, filed an affidavit (Doc. 4). On February 28, 2022, the Government filed a resistance (Doc. 5) to Galloway's motion. Galloway filed a reply (Doc. 10) on April 8, 2022. Galloway also filed two documents the Clerk's office docketed as correspondence (Docs. 12, 13).

On March 15, 2023, I entered an order (Doc. 14) directing Lahammer and the Government to file supplemental responses to address statements in Galloway's affidavit pertaining to a state plea agreement. Lahammer filed a supplemental affidavit (Doc. 15) on March 24, 2023, and the Government filed a supplemental response (Doc. 16) on April 13, 2023. Galloway filed a pro se reply (Doc. 19) to the supplemental response on May 8, 2023. The matter is now fully submitted. I find that neither an oral argument nor an evidentiary hearing are necessary.

## II.    APPLICABLE STANDARDS

### A.    Section 2255 Standards

A prisoner in custody under sentence of a federal court may move the sentencing court to vacate, set aside or correct a sentence. *See* 28 U.S.C. § 2255(a). To obtain relief, a federal prisoner must establish:

> [T]hat the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or [that the judgment or sentence] is otherwise subject to collateral attack.

*Id.*; *see also* Rule 1 of the Rules Governing § 2255 Proceedings (specifying scope of § 2255). If any of the four grounds are established, the court is required to "vacate and set the judgment aside and [to] discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

4

When enacting § 2255, Congress "intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (en banc) (citation omitted). Section 2255 does not provide a remedy for "all claimed errors in conviction and sentencing." *Id.* (citation omitted). Rather:

> Relief under [§ 2255] is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice.

*United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996) (citation omitted); *see also Sun Bear*, 644 F.3d at 704 ("[T]he permissible scope of a § 2255 collateral attack . . . is severely limited[.]"). A collateral challenge under § 2255 is not interchangeable or substitutable for a direct appeal. *See United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."). Consequently, "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id.* (citation omitted).

"Evidentiary hearings on [§ 2255] motions are preferred, and the general rule is that a hearing is necessary prior to the motion's disposition if a factual dispute exists." *Thomas v. United States*, 737 F.3d 1202, 1206 (8th Cir. 2013) (emphasis added). "The district court is not permitted to make a credibility determination on the affidavits alone." *Id.* at 1206; *see also United States v. Sellner*, 773 F.3d 927, 930 (8th Cir. 2014) ("[The] district court abused its discretion when it credited the attorney's affidavit over the petitioners without first holding an evidentiary hearing."). However, no hearing is required "where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *See New v. United States*, 652 F.3d 949, 954 (8th Cir. 2011) (citation omitted).

**B.    *Ineffective Assistance of Counsel Standards***

To establish a claim for ineffective assistance of counsel, a movant must prove that his attorney's representation "was 'deficient' and that the 'deficient performance prejudiced the defense.'" *Walking Eagle v. United States*, 742 F.3d 1079, 1082 (8th Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).   "Deficient" performance is performance that falls "below an objective standard of reasonableness," *Lafler v. Cooper*, 566 U.S. 158, 163 (2012) (citation omitted), that is conduct that fails to conform to the degree of skill, care and diligence of a reasonably competent attorney. *Strickland*, 466 U.S. at 687.   Matters of trial strategy are generally entrusted to the professional discretion of counsel and they are "virtually unchallengeable" in § 2255 proceedings.  *Loefer v. United States*, 604 F.3d 1028, 1030 (8th Cir. 2010).   Counsel is not constitutionally ineffective because of the failure to raise a "relatively sophisticated" and "counter-intuitive argument." *Donnell v. United States*, 765 F.3d 817, 821 (8th Cir. 2014).    However, "[s]trategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Holder v. United States*, 721 F.3d 979, 994 (8th Cir. 2013) (citation omitted).

To establish "prejudice," a movant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafler*, 566 U.S. at 163 (citation omitted).   "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.   That requires a "substantial," not just "conceivable," likelihood of a different result.   *Harrington v. Richter*, 562 U.S. 86, 112 (2011). Ultimately, a showing of "prejudice" requires counsel's errors to be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 104 (citation omitted).

Because a movant must show both deficient performance and prejudicial effect, a court reviewing ineffective assistance claims need only address one prong if either fails. *See Williams v. United States*, 452 F.3d 1009, 1014 (8th Cir. 2006).   Additionally, each

6

individual claim of ineffective assistance "must rise or fall on its own merits," meaning that courts should not take into account the "cumulative effect of trial counsel's errors in determining *Strickland* prejudice." *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006); *United States v. Brown*, 528 F.3d 1030, 1034 (8th Cir. 2008) ("[W]e have repeatedly rejected the cumulative error theory of post-conviction relief.").

## III.   ANALYSIS

Galloway argues her trial counsel was ineffective for failing to: (1) investigate, file pretrial motions, negotiate a plea agreement and seek a proffer to provide information against her co-defendant during the pretrial phase; (2) seek a residential drug and alcohol program recommendation from probation and the Court and (3) develop mitigation evidence and properly prepare for the sentencing hearing.

### A.   *Ineffective Assistance of Trial Counsel During Pretrial Phase*

Galloway's first ineffective assistance of counsel claim is that Lahammer provided constitutionally inadequate representation during the pretrial stage.   Doc. 1 at 4. Specifically, she alleges that Lahammer failed to: (1) properly investigate; (2) file "vigorous" pre-trial motions; (3) secure a "favorable" plea agreement; and (4) set up a proffer to testify against her co-defendant Plower. *Id.* at 17.   Galloway states counsel:

> failed to appreciate Petitioner's grave circumstances and do the necessary groundwork, including vigorous pre-trial motions and the obtaining of expert witnesses, to lay the groundwork for either a favorable plea agreement, and make good-faith efforts to set up a proffer by Petitioner to testify against her co-defendant, James Plower.

*Id.*

#### 1.   *Failure to Investigate*

Galloway alleges that Lahammer failed to investigate her alcohol usage, her mental health condition or her relationship with – and abuse by – Plower.  She asserts:

7

Defense counsel apparently was not up to the task of interviewing potential witnesses, obtaining affidavits, medical evidence, and evidence of her alcohol dependence, her mental health history, or utilizing Petitioner's troubled life history which included serious, ongoing domestic abuse, emotional abuse, and co-dependency by Plower, to assist her in her defense of the trial in chief, or during the penalty phase of the proceedings. Defense counsel failed to respond to Petitioner's fear of repercussions of coming forth with information at any time of my relationship with Plower, who had told me that he was planning to "take care" of his ex-wife Lisa, and then himself, and "would never see the inside of a prison," and then energetically follow up on that information provided by Petitioner.

Doc. 1 at 17-18.

Lahammer responds by stating that "there were no expert witnesses needed to rebut any of the evidence at trial." Doc. 4 at 2. The Government argues that Galloway "fails to establish that her counsel failed to investigate her case. She does not identify witnesses that her counsel should have interviewed or evidence he failed to gather." Doc. 5 at 10-11. Moreover, the Government argues that "counsel presented a defense at trial and movant has failed to establish that counsel could have presented any additional defenses by conducting additional investigation prior to trial." *Id*. at 11. The Government asserts that Galloway has "failed to establish what evidence would have been discovered by additional investigation, let alone how that evidence would affect either the guilt or sentencing phase." *Id*.

In her reply brief, Galloway asserts that "[p]hysical, mental and emotional abuse warrants reasonable investigation." Doc. 10 at 1. She identifies (for the first-time) witnesses she alleges Lahammer should have investigated and pursued. For example, she contends Lahammer could have called as an expert witness a police officer with the Anamosa Police Department who responded to a report of a domestic disturbance between Galloway and Plower on November 24, 2013.[1] *Id*. at 1-2. Galloway makes the

---

[1] A witness who provides "testimony to what he witnessed on that night" (Doc. 10 at 2) is a fact witness, not an expert witness.

conclusory allegation that "[w]itnesses would have been of benefit in Movant Galloway's trial and potentially changed the outcome of the trial." *Id.* at 2.

Generally, "[t]rial counsel has a duty to conduct a reasonable investigation or to make a reasonable determination that an investigation is unnecessary." *Kemp v. Kelley*, 924 F.3d 489, 500 (8th Cir. 2019). The question is whether "trial counsel was unreasonable in not exploring an alleged defense." *United States v. Vazquez-Garcia*, 211 F. App'x 544, 545 (8th Cir. 2007). "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). However, "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984)).

The decision not to call a witness is a 'virtually unchallengeable' decision of trial strategy." *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) (citation omitted). However, "failing to interview witnesses or discover mitigating evidence may be a basis for finding counsel ineffective." *Kramer v. Kemna*, 21 F.3d 305, 309 (8th Cir. 1994). "Such a failure is not … a conclusive indication of ineffective assistance of counsel." *Id.* Thus, while "'failing to interview witnesses or discover mitigating evidence may be a basis for finding counsel ineffective' . . . [the defendant] still needs to 'make a substantial showing that, but for counsel's failure . . . , there is a reasonable probability that the result of his trial would have been different.'" *Vazquez-Garcia*, 211 F. App'x at 545 (quoting *Kramer*, 21 F.3d at 309).

Here, Galloway advances a vague, conclusory claim that Lahammer should have done more to investigate or call witnesses to establish abuse in her relationship with Plower, mental health issues and substance abuse. I agree with the Government that

Galloway has failed to establish that Lahammer acted unreasonably in not exploring a defense that, even now, Galloway can describe in only a half-hearted outline.

In addition, Galloway has failed to establish that the outcome of the trial would have changed if Lahammer had conducted any additional investigation. With the exception of Galloway's son Isaac Williams, the potential witnesses described in Galloway's reply brief, appear to be relevant only with regard to her relationship with co-defendant Plower and/or Galloway's possible mental health or substance abuse issues.[2] Galloway references Plower's controlling and abusive behavior, but she does not assert that she was actually coerced into committing the crimes at issue, or that she was not otherwise in a sufficiently-culpable state of mind. The witnesses listed in her reply brief are not relevant to any identified defense. Galloway does not identify any exculpatory evidence or fact witnesses to rebut the Government's extensive evidence detailing her involvement in the arson and the insurance schemes. Therefore, there is no reasonable probability of a different outcome at trial.

---

[2] Galloway's reply brief also asserts that counsel should have called Galloway's son Isaac Williams, a Government witness, as a defense witness. Doc. 10 at 2. She states:

> Isaac had several head injuries between the fire and trial. . . . Medical reports could have been introduced as evidence or an expert witness to testify on Isaac's injuries and lack of memory that he stated he had when he was on the witness stand. Due to this lack of memory, his grand jury testimony was introduced leaving no opportunity to cross examine Isaac Williams with relation to his grand jury testimony. Isaac Williams could have been excluded as a witness had this been looked in to before the trial or at least been better prepared to cross examine the witness.

*Id.* This is simply wrong. Lahammer filed a motion in limine to preclude the Government from using Williams' grand jury testimony to impeach him when he testified at trial, explaining that it was anticipated he would be unable to recall the relevant events because of his severe head trauma. Crim. Doc. 37. Lahammer included exhibits supporting those injuries. Crim. Doc. 46. However, when Williams testified at trial, he did not claim a lack of recollection, but instead flatly denied that he and his mother had attempted to start a fire. It was that actual denial, rather than his lack of memory, that led to the admission of his contradictory grand jury testimony. Crim. Doc. 61 at 32-34. No further medical reports or expert witness would have changed this outcome.

Turning to her sentence, Galloway again has failed to show a reasonable probability that her sentence would have been reduced but for her counsel's allegedly deficient performance. The sentencing record contained mitigation evidence of domestic abuse, mental health issues and her history with alcohol. For example, the presentence investigation report (PSR) detailed mental health treatment Galloway received from Associates for Behavioral Healthcare and a mental health assessment as a condition of the Galloway's pretrial release by St. Luke's Counseling Center with a diagnosis of unspecified trauma and stressor related disorder. Crim. Doc. 70 at 16. During the sentencing hearing, Galloway read a statement in which she asserted she realized in 2014 she was in a "controlling, abusive, co-dependent relationship with Jim Plower . . . at the time these crimes occurred." Crim. Doc. 98 at 24.

I addressed the mitigating factors, including previous domestic abuse, during sentencing. For example:

> There are many mitigating factors here; I acknowledge that. And she mentioned some in her comments, and certainly Mr. Lahammer has done a fine job of pointing them out as well. I'm not going to recap all of them here, but I certainly understand that throughout her life, beginning at childhood, Ms. Galloway has been in difficult situations and has been, unfortunately, associated with abusive and difficult people who certainly have caused her to have difficulties in her life.

Crim. Doc. 98 at 28. I further noted that it was Plower, not Galloway, who initiated the arson plot. *Id.* at 30-31. However, I also found that "the nature and the circumstances of the offense here are extremely aggravating" and that "the evidence at trial demonstrated that Ms. Galloway used her minor son, Isaac, twice in an effort to burn this house down, had him go into the house; she didn't do it herself." *Id.* at 26-27. I further explained that the arson itself

> only started the criminal conduct. After that, obviously, there was the insurance claim and insurance proceeds received. And then, as Mr. Plower's role was detected and he began being investigated, then there was the withdrawal of $10,000 and an attempt to hide it to avoid having it frozen as being the ill-gotten gains of this insurance scheme. So this was -- not

11

only were there multiple attempts to burn down the house, so that took a period of time, but then, even after the fire, the criminal conduct continued. So I'm certainly taking all of that into account and find that to be aggravating.

*Id.* at 27-28. I found that a sentence of 144 months (including Count 2's mandatory minimum of 120 months) was the appropriate sentence, even though it was well below the advisory guidelines range of 190 to 207 months. *Id.* at 31. In doing so, I stated:

I do find that in light of the 120 months' sentence that is automatic on Count 2, that a sentence of 190 months or anything near 190 months would be far greater than necessary in this case. But I also find, in light of the aggravating factors I've talked about, that I cannot impose a sentence of just 120 months. I don't believe that would be sufficient or afford adequate deterrence.

*Id.* Thus, I found that the various aggravating factors precluded a sentence of just 120 months, regardless of how much mitigation evidence was presented. Galloway has failed to demonstrate there is a reasonable probability that any additional evidence of mitigating factors would have reduced her sentence below that which I imposed. As such, even if Galloway could establish deficient performance, she cannot show prejudice. This claim of ineffective assistance of counsel fails.

### 2.       *Failure to File Pretrial Motions*

Galloway asserts that Lahammer failed to file "vigorous" pretrial motions. Doc. 1 at 17. She offers no further explanation nor does she specify what "vigorous" pretrial motions he should have filed. Lahammer responds that he "thoroughly investigated the possibility for pretrial motions, and did file pretrial motions including a successful motion to recuse the initially assigned District Court Judge in his case, as well as a motion in limine to restrict the admission of prior sworn testimony from being admitted into evidence." Doc. 4 at 2. He further states that "[i]n Counsel's opinion there were no other non-frivolous motions that could have been filed." *Id.*

12

The Government argues that Galloway fails to demonstrate either deficient performance or prejudice. Doc. 5 at 11-12. I agree. Galloway does not identify any motions that Lahammer should have filed nor does she indicate how any such motion would have altered the outcome of her case. This claim of ineffective assistance of counsel fails.

### 3.     *Failure to Secure a Plea Agreement*

Galloway asserts in her § 2255 motion that Lahammer failed to lay the groundwork for and negotiate a plea agreement. In her affidavit, Galloway states that "shortly after the case commenced I was appointed assistant public defender John Bishop, who arranged a plea deal with the state wherein I would agree to plead guilty and in return receive a sentence of ten years." Doc. 1 at 26. She asserts that at the time of the offer she had not seen any of the evidence against her and that Bishop "had little interaction" with her. *Id.* Galloway contends that "shortly thereafter, I retained Michael Lahammer as defense counsel, who advised me that based upon his review of the discovery that I 'had a great chance of not being convicted' if I withdrew the plea deal." *Id.* She claims that "after going through the government's evidence against me I asked him to again seek the plea deal, but either he did not, or his efforts were unsuccessful" and that "when I saw the evidence against me, I did not think that I could win at trial." *Id.* She also states "[t]hat Michael Lahammer did not call one witness on my behalf, which caused me to seriously question his judgment in convincing me to withdraw my guilty plea." *Id.* Galloway thus asserts that she initially accepted the state's plea agreement but withdrew her acceptance based on Lahammer's advice.

Lahammer responds that Galloway was offered a plea to state charges with a 10-year sentence but it was "soundly rejected by Ms. Galloway." Doc. 4 at 2. Lahammer attaches a February 2, 2016, letter from the United States Attorney's Office to the Jones County Attorney asking whether a state court disposition, through which Galloway would plead guilty to aiding and abetting arson and agree to a sentence of 120 months, would

13

be acceptable to Jones County.[3]  Doc. 4-1 at 1-2.  Lahammer states that the state plea offer "was ***never*** accepted by Ms. Galloway" because "[s]he was adamant that she would not accept any offers that involved prison time."  Doc. 15 at 2 (emphasis in original). Lahammer also asserts that he subsequently negotiated two federal plea offers.  Doc. 4 at 2.  He states that "[i]n the subsequent federal plea negotiations, the agreements called for the U.S. Sentencing Guidelines to apply, with only the possibility of a downward variance at sentencing.  Both of these pleas were also rejected by [Galloway]" because they involved a prison sentence.  *Id.*; Doc. 15 at 2.  Lahammer concludes:

> To reiterate, there was never a state plea deal entered into, and Ms. Galloway never withdrew from any plea offers.  She instead rejected all of the offers as they would have all involved going to prison.  Further, she never asked the undersigned to seek the plea deal later in my representation, because the deal she was after was one involving no prison time.  That offer was simply never made to Ms. Galloway.

Doc. 15 at 2.

The Government argues that Galloway cannot establish either deficient performance or prejudice.  Doc. 5 at 13.  The Government notes that Galloway

> maintained her innocence at all the stages of [her] criminal prosecution and has not come forward with any evidence that she would have accepted a plea agreement.  The evidence establishes just the opposite, that Movant had no interest in a plea agreement, even one allowing her to resolve the case at the state level.  Movant rejected three separate plea offers.  Movant was committed to going to trial and maintaining her innocence and her counsel was not ineffective for failing to lay the groundwork for or otherwise negotiate a fourth plea offer.

*Id*.  In its supplemental response, the Government states that there was only a suggestion of a state plea offer, but "[t]hat offer was never accepted" and thus there was no plea

---

[3] This letter was sent five months before federal criminal charges were filed against Galloway, as the federal proceedings were commenced with a criminal complaint filed July 21, 2016.  *See* Case No. 16-mj-196, Doc. 2.  As noted above, the indictment was returned on August 23, 2016. Crim. Doc. 1.  Galloway elected to retain Lahammer on September 22, 2016.  Crim. Doc. 12. Bishop withdrew as counsel soon thereafter.  Crim. Docs. 13, 14.

agreement from which Galloway could have withdrawn. Doc. 16 at 1-2. The Government argues that "[t]here is no evidence in the record that Movant ever actually entered a plea agreement with any authority other than her assertion in the Petition in this matter." *Id.* at 1.

In her reply brief, Galloway denies that she rejected three plea offers. Doc. 10 at 3. She contends that, while represented by Bishop, she accepted and signed the state plea agreement but Lahammer advised her to withdraw her acceptance because

> she had not seen any evidence or discovery against her. Mr. Lahammer advised her that she should have been given the opportunity to go through discovery with previous counsel John Bishop prior to taking the deal.

*Id.* Galloway contends that her initial acceptance of the state plea offer contradicts the Government's argument that she maintained her innocence at all stages and is evidence that she would have accepted a plea agreement. *Id.*

However, in her reply to the Government's supplement response, Galloway changed her argument. Instead of asserting that she accepted the state plea offer and later withdrew that acceptance on counsel's advice, she states that she "followed defense counsel's advice to forego the plea" and "[u]nder the advisement of defense counsel, this state plea never developed." Doc. 19 at 2. Galloway repeatedly asserts that there was a plea offer and she was billed for time spent negotiating a plea, yet she no longer appears to contend that an offer matured into an actual executed plea agreement from which she subsequently withdrew her acceptance. Instead, she states that "[s]he didn't agree to it because she was advised not to." *Id.*

Galloway asserts in her reply brief, for the first time, that Lahammer failed to share the two subsequent federal plea offers with her. *Id.* Galloway states that "[h]ad Mr. Lahammer shared the plea agreements with Movant Galloway or further investigated the discovery while asking for an extension of the original plea agreement she signed to ensure that she had time to go over the discovery with her attorney, she would have been able to make an informed decision with the plea agreement in place." *Id.* She requests

15

discovery under Rule 6(b), including the plea agreements and correspondence between her attorneys and the Government, along with the appointment of counsel under Rule 6(a). *Id.*

With regard to the state plea offer, Galloway has demonstrated neither deficient performance nor prejudice. She does not, for example, assert that Lahammer provided factually inaccurate information about her sentencing exposure while providing advice. Rather, she asserts that he advised her to make an informed decision on a plea agreement by reviewing the Government's evidence first. Second, she asserts that he advised her that he believed she had a "great" chance of acquittal should she opt to proceed to trial. Even assuming Lahammer advised her to review the evidence and reject the state plea offer, Galloway cannot prove that her counsel's performance was deficient. A court's scrutiny of counsel's performance is "highly deferential," does not "second-guess strategic decisions or exploit the benefits of hindsight," and presumes that counsel's conduct "falls within the wide range of reasonable professional assistance." *Osborne v. Purkett,* 411 F.3d 911, 918 (8th Cir. 2005). Advice to review evidence and make an informed decision cannot be deemed objectively unreasonable. And assuming without finding that counsel advised her to go to trial, that advice also cannot be deemed constitutionally unreasonable.[4] Galloway has not established deficient performance with regard to the state plea offer.

To demonstrate prejudice at the plea-bargaining stage, Galloway must demonstrate a substantial likelihood that "(1) [s]he would have accepted the offer to plead pursuant to the earlier proposed terms, (2) neither the prosecution nor the trial court would have prevented the offer from being accepted, and (3) the plea terms would have been less severe than under the judgment and sentence that were actually imposed." *Allen v. United States*, 854 F.3d 428, 432 (8th Cir. 2017). To establish prejudice, a movant

---

[4] In an order denying Galloway's motion for judgment of acquittal, I found that Galloway was not entitled to acquittal on Count 1 but noted that "this case is closer than some, and does rely in substantial part on circumstantial evidence." Crim. Doc. 75 at 12.

16

"must show that, but for his counsel's advice, he would have accepted the plea." *Engelen v. United States,* 68 F.3d 238, 241 (8th Cir. 1995). Movants who consistently maintain their innocence fail to do so. "A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer." *Sanders v. United States,* 341 F.3d 720, 723 (8th Cir. 2003); *see also Chesney v. United States,* 367 F.3d 1055, 1059–60 (8th Cir. 2004) (movant who alleged counsel failed to communicate plea offer could not show prejudice because he adamantly denied guilt under oath at trial and he could not establish he would have accepted the plea agreement); *Sanders,* 341 F.3d at 722–23 (denial of § 2255 motion without hearing upheld when counsel provided inaccurate estimate of sentencing exposure but at all stages of criminal prosecution, prisoner showed no indication he was willing to admit guilt).

With respect to an evidentiary hearing, "[a] § 2255 motion may be dismissed without a hearing if (1) the criminal defendant's allegations, accepted as true, would not entitle him or her to relief; or (2) the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact. *Hyles v. United States,* 754 F.3d 530, 534 (8th Cir. 2014). To avoid dismissal and "command an evidentiary hearing, the movant must present some credible, non-conclusory evidence that he would have pled guilty had he been properly advised." *Engelen,* 68 F.3d at 241 (affirming dismissal without a hearing when movant maintained his innocence at trial and "made no direct assertion that he would have pled guilty if his counsel had provided him with additional information concerning the risks of trial.").

Here, Galloway does not present credible, non-conclusory evidence that she would have pleaded guilty pursuant to the state plea offer but for Lahammer's advice. *See Hyles*, 754 F.3d at 535 ("Nothing in the record indicates she wanted to accept the plea offer and would have acknowledged her guilt even if properly advised about the risks of

17

trial."). Galloway initially made the incorrect assertion that she actually accepted the state plea offer while represented by Bishop, but then withdrew her acceptance based on Lahammer's advice, and that this purported acceptance demonstrates that she would have pleaded guilty. However, when this assertion was challenged, she simply changed it. She now states that she did not agree to the state plea offer because Lahammer advised against doing so.

Viewing this change of position as charitably as possible, Galloway appears to conflate a plea offer with an accepted plea agreement. She submits no evidence that she actually accepted and signed a state plea agreement before she retained Lahammer. Instead, she points to the fact that she was billed by counsel for speaking with a government attorney about a plea. This simply demonstrates that negotiations occurred with respect to an offer, not that Galloway accepted an offer and entered into an agreement. There is no credible evidence of an actual plea agreement being formed after Galloway pleaded not guilty when Bishop was appointed on August 29, 2016. *See Moses v. United States,* 175 F.3d 1025, 1025 (8th Cir. 1999) (unpublished) ("Moses offers only his own self-serving statements made in his pro se § 2255 motion and brief that he would have accepted the plea agreement. . . . Moses's conclusory statements alone are not the sort of objective evidence required to establish a reasonable probability that he would have accepted the plea agreement absent his counsel's allegedly deficient performance.").

The only plea-related document submitted as a part of this record is the February 2, 2016, letter in which the United States Attorney's Office asked the Jones County Attorney whether a state court disposition in which Galloway would plead guilty to aiding and abetting arson, and agree to a sentence of 120 months, would be acceptable to Jones County. Doc. 4-1 at 1-2. The fact that this letter was sent does not, in any way, suggest that Galloway was willing to accept the proposed resolution. Moreover, during a December 21, 2016, status conference in this case, at which Galloway was personally present, the following exchange occurred:

THE COURT: Has the government proffered any plea offers to the defendant up to this point, Mr. Morfitt?

MR. MORFITT: Yes, Your Honor. A plea offer was made some time ago, I think perhaps even to the defendant's initial attorney that was representing her in this case. And that offer, um, has at least been told to Mr. Lahammer, that we would extend the same offer to him/her currently if, uh, if the defendant were interested in it.

THE COURT: And so at this point that's still in your mind an outstanding plea offer being made by the Government?

MR. MORFITT: Yes, Your Honor. Technically the actual deadline for the formal plea offer that was made has expired. But we have communicated to Mr. Lahammer that if, uh, the defendant is interested we would reextend that same offer.

THE COURT: Alright, so at this point you don't have an expiration date for that offer outstanding?

MR. MORFITT: Yes, correct, Your Honor.

12/21/2016 Status Conference.[5] This discussion occurred almost three months before trial commenced, and about three months after Lahammer filed his appearance as Galloway's counsel. Thus, even if Lahammer had actually talked Galloway out of accepting the state plea offer when he took over as Galloway's counsel, the status conference discussion made it clear that a plea offer was still pending, and could be accepted. There is no evidence that Galloway made any effort to do so.

A similar analysis applies to the other plea offers negotiated between Lahammer and the Government. The status conference discussion largely disposes of any suggestion that Galloway was someone unaware of the opportunity to enter into a plea agreement

---

[5] Because neither party ordered an official transcript of the status conference, I listened to the court's FTR Gold recording of that conference and have attempted to quote the relevant discussion verbatim. The discussion about plea offers occurred at approximately 12:24 p.m. during the December 21, 2016, status conference.

with the Government. Thus, she cannot show deficient performance by Lahammer.

Moreover, even if a movant shows that trial counsel failed to convey a plea offer to the movant, the movant must also "show 1) that he would have accepted the original plea offer, and 2) thereby would have received a lighter sentence." *Willis v. United States*, No. 07-00473-CV, 2007 WL 2907985, at *2–3 (W.D. Mo. Oct. 2, 2007); *see also Allen v. United States*, 854 F.3d 428, 432 (8th Cir. 2017) (holding that defendant "must demonstrate a substantial likelihood that … the plea terms would have been less severe under the judgment and sentence that were actually imposed"). Thus, even assuming Lahammer failed to convey the Government's plea offers to Galloway, she cannot establish prejudice because she is unable to show she would have received a lighter sentence had she pleaded guilty pursuant to those offers. Lahammer states that the proposed plea agreements "called for the U.S. Sentencing Guidelines to apply, with only the possibility of a downward variance at sentencing." Doc. 4 at 2. Because Galloway received a substantial downward variance at sentencing, she is unable to establish that she would have received an even lighter sentence had she pleaded guilty. *See United States v. Muhammad*, No. CR 14-408, 2017 WL 3588755, at *2 (D. Minn. Aug. 18, 2017) (holding movant could not show prejudice when "removing all speculation, the court sentenced Muhammad to 96 months, which is lower than the amount the government offered."); *Hartstein v. United States,* Case No. 4:10–CV–2301, 2014 WL 1314896, at *2 (E.D. Mo. Mar. 28, 2014) (movant could not show prejudice for failure to convey plea offer because the plea offer did not contain a specific sentencing recommendation).

Because Galloway cannot show that she would have received a lighter sentence if she had accepted a plea offer that was tendered by the Government, she cannot demonstrate prejudice. This ineffective assistance of counsel claim fails.

20

#### 4. Failure to Set Up a Proffer to Testify Against Co-Defendant

Galloway also asserts that Lahammer provided ineffective assistance during the pretrial phase by failing to set up a proffer to testify against co-defendant Plower. Doc. 1 at 17. Lahammer notes that Plower was sentenced after pleading guilty on June 10, 2015, and thus his prosecution was already concluded before Galloway retained Lahammer in September 2016. Doc. 4 at 2. Thus, "there was no opportunity for Ms. Galloway to proffer or cooperate against" Plower. *Id.* The Government argues that Galloway "fails to establish that she could have had the opportunity to cooperate against her co-conspirator, let alone that she would have done so given that she maintained her innocence through a trial, or that it would have affected the outcome of her case." Doc. 5 at 14.

The Government is correct. Plower pleaded guilty and was sentenced long before Galloway was indicted and Lahammer was retained. Lahammer had no opportunity to negotiate such a proffer and his performance as Galloway's counsel could not have been deficient in this respect. Moreover, there is no reason to believe Galloway would have been willing to testify against Plower and that she therefore was prejudiced. She states that she suffered "extreme mental and physical abuse" at Plower's hands and feared him. Doc. 1 at 17, 26. But she never actually asserts that she would have been willing to testify against him. Thus, this assertion of ineffective assistance of counsel fails: she has demonstrated neither deficient performance nor prejudice. This claim of ineffective assistance of counsel fails.

### B. Ineffective Assistance for Failure to Seek RDAP Recommendation

The basis for Galloway's second claim of ineffective assistance of counsel is that Lahammer failed to seek a recommendation for the Residential Drug and Alcohol Program (RDAP) at sentencing. Doc. 1 at 5, 20. She asserts that "[t]he RDAP program is one of the few sentence-relief programs available to individuals like Petitioner who suffered from drug and alcohol abuse, combing both much-needed education and

21

rehabilitation with the possibility of a reduced sentence of up to one year if the participant successfully completes the program." *Id.* She asserts that Lahammer should have been aware of the program and suggested it as a means of reducing her sentence. *Id.*

Lahammer responds that the PSR needs to contain information supporting qualification for RDAP in order for the court to recommend it. Doc. at 4 at 3. He states:

> Her [PSR] reported a single instance of marijuana use at age 16, and her alcohol information reported that she had stopped all alcohol use in August 2016, or a year previously. Further, while she may have had episodes of binge drinking "once or twice" a month, by 2014 she had cut her alcohol consumption down to "one or two beers, once or twice a month." The record simply did not support any request for RDAP at sentencing.

*Id.* Similarly, the Government notes that "nothing in [Galloway's] PSR or history or characteristics indicate that she had a drug or alcohol addiction or that this addiction contributed to [her] commission of the current offense." Doc. 5 at 14. Thus, "there was no reason for [her] counsel to request [her] inclusion or RDAP and there is no evidence that [she] would have been included in the RDAP program even if her counsel requested it." *Id.* The Government contends that Galloway has failed to demonstrate either deficient performance or prejudice.

In her reply brief, Galloway agrees that her "alcohol use was minimal at the time of pretrial and post trial and when the PSI interview was conducted." Doc. 10 at 3. She contends, though, that counsel was aware of her past alcohol use and should have had her undergo testing or professional assessments. *Id.*

The PSR states that Galloway "tried marijuana one time at age 16" and that:

> Between ages 16 and 40, she would binge drink once or twice per month, drinking to intoxication. At age 40, she drastically reduced her alcohol consumption to one to two beers, once or twice per month. She stopped all alcohol use in August 2016 at age 42.

Crim. Doc. 70 at 16. The PSR also states that Galloway was court ordered to complete a substance abuse treatment program in 2014 but she quit the treatment when charges were dismissed. *Id.* Galloway objected to a condition of supervision in the PSR that

22

barred her from using or possessing alcohol, stating that "she does not have issues with alcohol." Crim. Doc. 67 at 3; Crim. Doc. 70 at 21. I sustained that objection. Crim. Doc. 87; Crim. Doc. 98 at 21-22.

Galloway has failed to demonstrate deficient performance. The PSR reflects that by the time Galloway was indicted, she had stopped all alcohol consumption and that for two years prior to that she was consuming one to two beers once or twice per month. Galloway does not assert that counsel had any reason to believe or had been informed that was incorrect. She only points to alcohol usage several years prior. Galloway fails to demonstrate she qualified for RDAP and that her counsel's performance fell below an objectively reasonable standard for failing to seek it.

Galloway similarly fails to demonstrate prejudice arising from the failure to request RDAP. The Bureau of Prisons (BOP) has full discretion over whether to place a defendant in RDAP. A court may recommend RDAP but has no authority to order the BOP to admit a defendant into the program. *See* 18 U.S.C. § 3621; *Tapia v. United States,* 564 U.S. 391, 331-32 (2011). Galloway cannot establish prejudice based on the possibility that I might have recommended her inclusion in RDAP, as she has failed to show that the BOP would have deemed her qualified for the program and accepted that recommendation.

Moreover, regardless of whether Galloway would qualify, courts have found that trial counsel's failure to request RDAP does not prejudice a defendant. *See, e.g., United States v. Miller*, 953 F.3d 804, 813 (D.C. Cir. 2020) ("[E]ven assuming that trial counsel's failure to ask the district court for an RDAP recommendation fell below an objective standard of reasonable performance, Miller has failed to show a reasonable probability that he would have actually been placed in RDAP had he received a recommendation from the district court."); *United States v. Smith*, No. CR 12-20066-32-KHV, 2016 WL 2958454, at *3 (D. Kan. May 23, 2016) ("Because the Court's recommendation on treatment programs is not part of defendant's sentence, he cannot show that counsel's failure to seek such a recommendation likely altered the outcome of

23

sentencing."); *Jones v. United States*, Nos. 7:08–CR–105–01, 7:10–CV–22, 2010 WL 4484532, at *5 (E.D.N.C. Oct. 25, 2010).  Galloway fails to demonstrate a reasonable probability that the BOP would have admitted her into RDAP and she would have received a more favorable sentence had counsel asked the court to recommend RDAP. This claim of ineffective assistance of counsel fails.

## C.    *Ineffective Assistance During the Sentencing Phase*

Galloway's final claim of ineffective assistance of counsel is that counsel provided constitutionally inadequate representation "by failing to properly prepare for the sentencing hearing and by failing to develop mitigation evidence relative to physical trauma and mental health issues, including domestic abuse."  Doc. 1 at 7, 20.  Galloway alleges that trial counsel "failed to properly [] develop the previous factual statement regarding domestic violence, alcohol dependence, and mental health issues."  *Id.* at 21. She argues that trial counsel "failed to arrange for a mental health examination of Petitioner to ascertain the nature of the serious physical and mental abuse that she suffered at the hands of Plower, which were only minimally documented in her PSI" and failed to use expert testimony to establish mitigation characteristics.  *Id.* at 22-23.  This claim appears to substantially overlap with her first claim, which asserts in part that counsel failed to develop evidence of "domestic abuse, emotional abuse, and co-dependency by Plower, to assist . . . during the penalty phase of the proceedings."  *Id.* at 17.

Lahammer responds that he "submitted numerous sentencing exhibits including several character letters, details of Ms. Galloway's custody arrangement, her extensive work accomplishments as a Nurse, and her complete health summary for the Court's consideration."  Doc. 4 at 3.  He also notes that he "filed a Motion for Downward Variance citing Ms. Galloway's past history as a domestic abuse victim as well as her strong ties to her church and community."  *Id.*

The Government argues that "the record indicates Movant's counsel vigorously advocated for his client at sentencing.  Counsel filed numerous sentencing exhibits and

24

secured a downward variance for Movant. Movant fails to allege, let alone demonstrate, how her counsel could have performed better during the sentencing phase of her case, let alone that it would have resulted in a different outcome for her case." Doc. 5 at 14-15.

Galloway has not shown that her counsel acted unreasonably in preparation for her sentencing hearing. Lahammer submitted numerous character letters (Crim. Doc. 85-1) and filed a successful motion for downward departure (Crim. Doc. 84) based in part on Galloway's family background, past domestic abuse, child custody situation and employment history. Mental health diagnoses and assessments, along with Galloway's history with alcohol and domestic abuse, were detailed in the PSR. Galloway has not identified additional evidence of mitigating factors that Lahammer could and should have presented. She has failed to demonstrate that Lahammer's performance in preparation for sentencing was deficient.

Even if I were to assume that counsel's performance was objectively unreasonable during the sentencing phase, that failure did not prejudice Galloway. As previously detailed, I noted during the sentencing hearing my consideration of many mitigating factors in Galloway's case, including her association with abusive people and my belief that it was Plower who initiated the arson plot. Crim. Doc. 98 at 30-31. However, I also noted the "extremely aggravating" circumstances in the case as well, including her use of her minor son to attempt to burn down the house, the seriousness and risks of arson, and the continuing nature of the criminal conduct through the use of and attempts to hide the insurance proceeds. *Id.* at 26-28. I noted that those aggravating factors prevented a sentence of just 120 months as insufficient to constitute adequate deterrence. *Id.* at 31. Thus, I granted a downward variance from the range of 190 to 207 months to a sentence of 144 months. *Id.* at 31. I made it clear that I fully considered mitigating factors in granting the downward variance but the presence of aggravating factors limited that departure.

Nothing in Galloway's current motion gives rise to any possibility that she would have received an even lower sentence but for Lahammer's allegedly-deficient

25

performance. Galloway's criminal behavior was simply appalling. If anything, she is fortunate that her ultimate sentence was not higher. Because Galloway cannot establish either deficient performance or prejudice, this claim of ineffective assistance of counsel fails.[6]

## IV.   CERTIFICATE OF APPEALABILITY

In a § 2255 proceeding before a district judge, the final order is subject to review on appeal by the court of appeals for the circuit in which the proceeding is held. 28 U.S.C. § 2253(a). However, unless a circuit judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. § 2253(c)(1)(A). A district court possesses the authority to issue certificates of appealability under § 2253(c) and Federal Rule of Appellate Procedure 22(b). *See Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). Under § 2253(c)(2), a certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003); *Tiedeman*, 122 F.3d at 523. To make such a showing, the issues must be debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. *See Miller-El*, 537 U.S. at 335–36 (reiterating standard).

Courts reject constitutional claims either on the merits or on procedural grounds. "'[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he [movant] must demonstrate that

---

[6] I decline to address Galloway's claim, asserted for the first time in her reply brief, that counsel was deficient for not seeking clarification of whether she was charged with 18 U.S.C. § 844(h)(1) or 844(h)(2). Doc. 10 at 4. *See Hohn v. United States,* 193 F.3d 921, 923–24 n. 2 (8th Cir.1999) (declining to address claims raised for the first time in a § 2255 reply brief); *United States v. Deering,* 179 F.3d 592, 597 (8th Cir.1999) (noting that the court need not address an argument made for the first time in a reply brief), *cert. denied,* 528 U.S. 945 (1999). Even if I accepted the addition of this claim as an amendment, it would be untimely because the claim was filed as a part of the reply brief on April 8, 2022, well after the one-year statute of limitation under 28 U.S.C. § 2255(f) expired on October 7, 2020.

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). When a motion is dismissed on procedural grounds without reaching the underlying constitutional claim, "the [movant must show], at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Having thoroughly reviewed the record in this case, I find that Galloway failed to make the requisite "substantial showing" with respect to any of the claims raised in her § 2255 motion. *See* 28 U.S.C. § 2253(c)(2); FED. R. APP. P. 22(b). Accordingly, a certificate of appealability will not issue. If she desires further review of her § 2255 motion, Galloway may request issuance of the certificate of appealability by a judge of the Eighth Circuit Court of Appeals in accordance with *Tiedeman*, 122 F.3d at 520–22.

## V.     CONCLUSION

For the reasons set forth herein,

1.     Beth Galloway's motion (Doc. 1) pursuant to 28 U.S.C. § 2255 is **denied** as to all claims and this action is **dismissed with prejudice**.

2.     The Clerk of Court shall **close this case**.

3.     A certificate of appealability will **not issue**.


**IT IS SO ORDERED.**

**DATED** this 9th day of June, 2023.

_____
Leonard T. Strand, Chief Judge